

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| STEPHAN DICOMITIS, | CV 16–94–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| UNITED PARCEL SERVICE, INC., | |
| Defendant. | |

Before the Court is Defendant's motion for summary judgment. For the

reasons explained below, the Court grants the motion.

## BACKGROUND[1]

### I. Dicomitis' Injury and Work Status Until 2009

Plaintiff Stephan Dicomitis ("Dicomitis") began working for United Parcel

Service, Inc. ("UPS") in 1986 as a seasonal employee. In 1988, Dicomitis became

a full-time employee working as a package care driver based in the Missoula UPS

center. Dicomitis' employment was subject to the terms of the Collective

---

[1] The following facts are taken from Dicomitis' Complaint (Doc. 4), Dicomitis' Amended
Complaint (Doc. 13), Dicomitis' Deposition Excerpts (Doc. 17-1), and the parties' Statements of
Undisputed and Disputed Fact (Docs. 17 and 21).

Bargaining Agreement ("CBA") between UPS and the Teamsters Union Local No. 2 (the "Union"). (Doc. 17-6.) Between 2002 and 2013, the essential job functions of a package driver included, but were not limited to: delivering and picking up packages at a constant pace for an average of 9.5 hours per day plus extended hours depending on service needs; lifting, lowering, pushing, pulling, leveraging, and manipulating equipment and packages weighing up to 70 pounds; assisting in moving packages up to 150 pounds; and lifting packages to heights above the shoulder and lower packages to foot level.[2] Shifts were expected to last about 9.5 hours long, but could be increased up to 14 hours, typically around the holidays.

On or about October 28, 2002, Dicomitis suffered a work-related injury to his shoulder and went on a leave of absence because he was unable to work. He filed a workers' compensation claim, which was processed and settled by UPS's workers' compensation carrier.

In April 2003, Dicomitis' physician, Dr. Mark Rotar, released him to light-duty work for no more than four hours per day, but restricted him from doing any

---

[2] Dicomitis disputes documents listing the essential job functions on the basis of lack of proper foundation. (Doc. 21 at 3.) However, these documents are UPS Essential Job Documents which were stipulated to being authentic without objection during discovery and which are admissible business records. (Docs. 17-3, 17-4, 17-5; Fed. R. Evid. 803(6).)

overhead work.[3]  UPS put Dicomitis on a temporary light-duty assignment until May 6, 2003.  In an effort to get Dicomitis back to his regular position, UPS modified his truck by changing the placement of packages in order to ensure large and heavy items were not stacked up high.[4]  In July 2003, Dicomitis underwent a Functional Capacity Evaluation with Dr. Rotar who concluded that Dicomitis was not capable of returning to heavy-duty work.  The Evaluation restricted him to "medium-duty" work, which prevented him from lifting anything over 50 pounds and limited him to an eight-hour work day.  This restriction prevented Dicomitis from safely performing his new modified position and working the required hours of his shifts.

Dicomitis' last day at UPS working in any capacity was June 3, 2003. Although he was unable to work, Article 2, Section 2(c) of the CBA provided that Dicomitis could not lose his UPS seniority status while on leave for three years from the date of his disability.

Employees were required to make accommodation requests with UPS's Human Resources center in Omaha, Nebraska.  In September 2003, given his work

---

[3] Dicomitis disputes this as inadmissable hearsay. (Doc. 21 at 4.) However, these restrictions by Dr. Rotar were described in the Functional Evaluation and in Dicomitis Deposition. (Docs. 17-1 at 19; 17-10.)

[4] Dicomitis disputes this as inadmissable hearsay. (Doc. 21 at 4.) However, this was described by Dicomitis in his own deposition. (Doc. 17-1 at 9.)

-3-

restrictions and pursuant to ADA procedures requiring a request in writing, Dicomitis submitted a written request to UPS's Human Resources center for accommodations under the ADA. To fully review his request, UPS sought further medical information from Dicomitis. In response to the medical request, Dr. Rotar confirmed that Dicomitis could not perform all the essential functions of his position and restricted his work to eight hours per day on a permanent basis. (Doc. 17-13.) On January 12, 2004, after "carefully evaluat[ing]" Dicomitis' request, UPS denied the request for an ADA accommodation "based upon the medical information" received. (Doc. 17-14.) UPS continued Dicomitis' leave.

On February 3, 2004, Dicomitis attended a meeting with UPS representatives at which he was told that he could not perform the essential functions of his job and that there were no alternative positions that would accommodate his physical restrictions. On March 1, 2004, Dicomitis filed a grievance with the Union regarding UPS's decision. The Union denied Dicomitis' claim and recommended that he submit another request for accommodations to UPS.

On October 5, 2004, Dicomitis wrote to the UPS center manager to ask if there were any light-duty seasonal positions he could work given his physical restrictions. In the letter, Dicomitis asked the center manager to forward his

request to Human Resources, as he knew his request needed to go through Human Resources to be properly submitted.

In March 2005, Dicomitis underwent a second Functional Capacity Evaluation by Dr. Rotar. It was Dr. Rotar's opinion that Dicomitis had "reached maximum medical improvement. He has some significant limitations in his ability to work and he will be restricted to medium duty activities with moderate weight restrictions." (Doc. 17-19.) On March 13, 2005, following a workers' compensation inquiry, Dr. Rotar restated his restrictions for Dicomitis, restricting him to lifting a maximum of 35 pounds and working an eight-hour day. Dr. Rotar further conveyed his opinion that he did not anticipate Dicomitis would ever return to his time of injury position. (Doc. 17-20.) Dicomitis settled his workers' compensation claim against UPS on April 20, 2015, after reaching maximum medical improvement status.

In June 2005, Dicomitis submitted a second request to UPS's Human Resources, asking about alternative positions at UPS because Dr. Rotar would not release him back to his former package car driver position without restrictions. (Doc. 17-21.) Dr. Rotar identified Plaintiff's permanent restrictions as: "he cannot lift above shoulder height with right arm, he cannot lift or carry more than 25 pounds, and reaching and manipulating with right arm are limited." (Doc. 17-22

at 1.) On August 9, 2005, UPS denied the request for accommodation. In the denial letter, UPS stated to Dicomitis that after careful evaluation of his request, they were "unable to conclude that [he was] eligible for a reasonable accommodation pursuant to the Americans with Disabilities Act." (Doc. 17-23.) Thus, Dicomitis' leave was continued. After 2005, Dicomitis did not submit another written request for ADA accommodations to the UPS Human Resources center.

In September 2005, Dicomitis verbally requested accommodations regarding other positions, but was informed there were no available positions with his physical restrictions. In order for Dicomitis to retain seniority status with UPS, he was required to retain employment with UPS in some capacity by July 3, 2006. In February 2006, Dicomitis contacted the Union about his employment. The Union forwarded his questions to the Labor Coordinator at UPS. On April 13, 2006, Dicomitis sent another letter to the Labor Coordinator.

Dicomitis underwent shoulder surgery on June 23, 2006, but Dr. Rotar continued to restrict Dicomitis' work. (Doc. 17-27.) On October 25, 2007, Dicomitis sent a letter to the Union requesting them to contact the UPS concerning his "disposition as a UPS employee." (Doc. 17-28.) He continued to contact UPS through November and December of 2007, requesting placement in a seasonal

position during the holiday season. UPS informed him that he was on leave, that there were no available jobs at UPS, and that UPS did not need seasonal help.

In February 2008, Dr. Rotar continued implementing permanent restrictions on Dicomitis' work. (Doc. 17-30.) In March 2008, Dicomitis spoke with UPS Human Resources regarding his leave-of-absence status and what UPS would do "if and when [he] is able to return to work," but did not request accommodations. In April 2008, Dicomitis attended a follow-up with Dr. Rotar. Dr. Rotar again concluded that Dicomitis had permanent lifting and movement restrictions and was not released for work. Shortly thereafter, the Social Security Administration deemed Dicomitis fully disabled. (Doc. 17-32.)

On October 31, 2008, Dicomitis sent a letter to the Union relaying that he had not been properly represented by the Union and requested answers to his questions from UPS about whether they would provide reasonable accommodations for him to go back to work. Since 2008, Dicomitis has not known the requirements for jobs at UPS, has not been released to work any jobs at UPS, and has not applied for any jobs at UPS.

In October 2009, Dicomitis again contacted the Union and again was informed that there was no available work that he could perform at UPS. Dicomitis admits that he has not verbally inquired about accommodations since

2009. (Doc. 17-1 at 71.)

## II.    Dicomitis' Discrimination Claim Against UPS in 2010

In March 2010, Dicomitis filed a charge of disability discrimination with the

Montana Human Rights Bureau ("MHRB") alleging that UPS failed to notify him

of job openings and failed to accommodate his disability.  The MHRB dismissed

his complaint as untimely because Dicomitis had not filed his charge within 180

days of the alleged discrimination.  (Doc. 17-35.)

In December 2010, the Montana Human Rights Commission ("the MHRC")

affirmed the dismissal and notified Dicomitis that if he chose to commence a civil

action in district court, he had to do so within 90 days of the date of their decision.

## III.   Dicomitis' Contact With the Union and UPS from 2011–2014

In January 2011, Dicomitis filed a grievance with the Union about his leave

status, sick and vacation pay, and UPS's failure to provide him with an alternate

job.  The Union denied his claim.  In December 2011, a Union representative

emailed the UPS Labor Coordinator asking whether Dicomitis could work during

peak season.  The record does not indicate that the UPS Labor Coordinator

responded to the email.  (Doc. 17-37.)

In early September 2014, UPS performed a records review of Dicomitis

revealing that he had been on injury leave for over eleven years and that the three-

year period of leave provided by the CBA expired in 2006. On September 11, 2014, UPS terminated Dicomitis' employment. His termination letter explained that he was terminated at that time because he had been on injury leave for greater than three years, which resulted in the complete loss of his seniority rights pursuant to the CBA.

## IV. Post-Termination

In May 2015, Dicomitis filed another charge of disability against UPS with the MHRB alleging that UPS discriminated against him when it terminated him. (Doc. 17-8.) The MHRB found no unlawful motive in terminating him, the MHRB found no reasonable cause to believe unlawful discrimination occurred and dismissed the charge in January 2016. (Doc. 17-9.) After the MHRB dismissed the charge, Dicomitis filed this lawsuit alleging that UPS discriminated against him by failing to make reasonable accommodations and by terminating his employment due to his disability. Dicomitis claims that UPS violated the Montana Human Rights Act, the American Disabilities Act, and the ADA Amendments Act. (Doc. 1-1 at 9.)

## LEGAL STANDARD

Summary judgment is proper if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of informing the Court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The movant's burden is satisfied when the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252 (1986). Where the moving party has met its initial burden, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (internal quotation marks omitted).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–248. The elements of each claim determine which facts are material. *Id.* at 248. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude entry of summary judgment. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there

-10-

is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).

## ANALYSIS

### I. Dicomitis' Accommodation Claims From 2003 to 2009

#### A. Administrative Exhaustion and Statute of Limitations

UPS argues that after the MHRC dismissed Dicomitis' 2010 discrimination charge, Dicomitis had the opportunity to file a civil complaint within 90 days but chose not to do so. Thus, all accommodation claims between 2003 to 2009 are barred by the applicable statute of limitations. Dicomitis does not respond to this argument.

The MHRA is the exclusive remedy for employment discrimination cases and claims must be filed within 180 days from when "the alleged unlawful discriminatory practice occurred or was discovered." Mont. Code Ann. §§ 49–2–501(4)(a), 512(1) (2017).[5] If the charging party initiates efforts to resolve the dispute underlying the complaint by filing a grievance as established by a

_____

[5] The 180-day and 90-day statutes of limitations found in Mont. Code Ann. §§ 49–2–501(4)(a) and 49–2–512(3), respectively, supersede the three-year tort statute of limitations found in § 27–2–204. *See* § 49–2–512(1) (providing that the MHRA is the exclusive remedy for employment discrimination claims and requiring all such claims to comply with the procedures of the MHRA); *see also Chance v. Harrison*, 899 P.2d 537, 538–540 (Mont. 1995) (applying the three-year statute of limitations to tort claims and the 180-day statute of limitations to MHRA claims in light of 1987 amendment to the MHRA which first established the exclusive nature of the Act).

collective bargaining agreement, the complaint may be filed within 180 days after the conclusion of the grievance. Mont. Code Ann. § 49–2–501(4)(b). If the MHRC decides to dismiss the charge, plaintiffs must file their civil suit within 90 days of the decision. Mont. Code Ann. § 49–2–512(3). "The limitations periods, while guaranteeing the protection of the civil rights laws to those who promptly assert their rights, also protect employers from the burden of defending claims arising from employment decisions that are long past." *Delaware State Coll. v. Ricks*, 449 U.S. 250, 256–57 (1980).

Under UPS standards, employees seeking accommodations must make the request through the UPS's Human Resources center in Omaha, Nebraska. On June 10, 2005, through his Union representative, Dicomitis properly applied for an ADA accommodation with UPS through Human Resources. However, since 2005, Dicomitis has not requested any accommodations through UPS's Human Resources center. Dicomitis asserts his Union representative sought an open position for him during the 2009 holiday season. However, Dicomitis has provided no proof of any request within the required 180-day statute of limitations period. This is the reason why MHRB dismissed Dicomitis' complaint as untimely. This Court agrees that any discrimination claims between 2003 and 2009 are untimely because they were not filed within 180 days of when the alleged

-12-

conduct occurred or was discovered.[6] Dicomitis did not properly exhaust his 2003 to 2009 claims under the MHRA.

Furthermore, Dicomitis did not file a civil lawsuit within the required 90 days after the dismissal of his 2010 charge. Dicomitis filed a discrimination claim with the MHRB on March 12, 2010, alleging that UPS failed to notify him of job openings or accommodate his disability. (Doc. 17-35 at 2.) The MHRB dismissed the charge as untimely, and the MHRC affirmed the decision on December 6, 2010. Dicomitis did not file a civil suit regarding that dismissal within 90 days, so he is now time barred from bringing an action for any claims from 2003 to 2009.

## B. Res judicata

UPS argues that Dicomitis' accommodations claims from the time of the injury to 2009 are barred by res judicata. Dicomitis does not respond to this argument.

Since the MHRA is the exclusive remedy for discrimination cases, filing a charge with the MHRC is a prerequisite to filing suit in court and a charging party may only commence suit after the agency has reached a final decision. *Mont. Code Ann.* § 49–2–512(1); *Hash v. U.S. W. Commc'n Serv.*, 886 P.2d 442,

---

[6] Dicomitis filed his first charge of discrimination on March 12, 2010. Thus, the 180-day period started on September 11, 2009, and any alleged discriminatory conduct that occurred before that date would be untimely.

-13-

444–445 (Mont. 1994). UPS contends that through his 2010 MHRA

discrimination charge, Dicomitis had already litigated his disability

accommodation claims and UPS's decision that he could not return to work.

Dicomitis does not dispute that his claims are barred by res judicata.

"The doctrine of res judicata prevents a party from relitigating a matter that

the party has already had an opportunity to litigate." *Slice v. Ferriter*, No. CV 07-

0004-H-DWM-RKS, 2009 WL 2948582, at *8 (D. Mont. May 27, 2009) (internal

quotation marks omitted). Res judicata applies to final decisions from

administrative proceedings, including those under the MHRA, and it is appropriate

where:

> (1) the parties or their privies are the same; (2) the subject matter of
> the present and past actions is the same; (3) the issues are the same
> and relate to the same subject matter; and (4) the capacities of the
> persons are the same in reference to the subject matter and to the
> issues between them.

*Id.* at **7–8 (internal quotation marks omitted).

The prerequisites of res judicata regarding all discrimination before 2009

has been met. First, the parties to the dispute in this lawsuit are the same as the

discrimination claim in 2010—Dicomitis is alleging a violation against UPS.

Second, the subject matter of the actions is the same because it involves the same

injury, oral and written requests for accommodations between 2003 and 2009, and

-14-

alleged violations by UPS for the failure to accommodate. Third, the issue at bar in this proceeding is the same issue brought before the MHRB in 2010: whether a violation of the MHRA or ADA occurred by UPS's alleged failure to accommodate. Lastly, the capacities of Dicomitis and UPS are the same in regards to the subject matter and issues. Therefore, under the doctrine of res judicata, his claims regarding UPS's actions between 2003 to 2009 are dismissed.

## II.    Dicomitis' Accommodation Claims From 2010 to 2014

UPS next argues that Dicomitis' accommodation claims brought after 2010 and before his dismissal in 2014 were not administratively exhausted and are barred by the applicable statute of limitations. Dicomitis does not respond to this argument.

As indicated above, to establish subject matter jurisdiction over his accommodation claims, Dicomitis must have exhausted his administrative remedies by filing a timely charge with the MHRB. Mont. Code Ann. § 49–2–501(4)(a). This affords the agency an opportunity to investigate the charge. *Jackson v. St. Vincent Healthcare*, No. CV 15-115-BLG-SPW, 2017 WL 748976, at *5 (D. Mont. Feb. 24, 2017).

After Dicomitis was terminated on September 22, 2014, he timely filed a grievance to the Union. On March 18, 2015, the Union panel denied his claim and

upheld the termination under the CBA. On May 7, 2015, within the 180-day

window, Dicomitis filed a charge of discrimination against UPS with the MHRB

alleging UPS discriminated against him when it terminated him. (Doc. 17-8.)

Dicomitis' MHRB discrimination claim in 2015 did not include his current

allegations that UPS discriminated against him by failing to accommodate his

disability. Rather, Dicomitis stated in the complaint to MHRB that he believed

UPS discriminatorily discharged him on the basis of his disability and/or in

retaliation for complaining about his discrimination. (Doc. 17-8.) Because the

charge did not encompass any violations by UPS for failing to accommodate

Dicomitis' disability, any claims arising from accommodation requests between

2010 and 2014 have not been administratively exhausted and are dismissed.

## III.    Termination Claims

### A.    Administrative Exhaustion and Statute of Limitations

UPS next argues that although Dicomitis filed his 2015 charge within the

limitations period after his termination, his claims are in fact untimely because the

alleged discriminatory actions occurred years before the filing. Dicomitis does not

respond to this argument. The same statute of limitations under the MHRA apply.

*See* Mont. Code Ann. §§ 49–2–501(4)(a), 512.

Dicomitis was terminated from UPS on September 11, 2014. He grieved his

termination with the Union, but the panel denied his claim and upheld his termination under the CBA. On May 7, 2015, he filed a charge of discrimination against UPS with the MHRB. (Doc. 17-8.) The MHRB found no unlawful discrimination and dismissed the charge. (Doc. 17-9.) The MHRC affirmed the MHRB on January 24, 2016.

Dicomitis filed his Complaint in the Montana Fourth Judicial District Court on April 21, 2016. This was within 90 days under Mont. Code Ann. § 49–2–512, so it is not time barred pursuant to statute. However, UPS claims that it was not his actual termination that started the running of the statute of limitations, but the date when he discovered the facts giving rise to his alleged illegal discrimination claims—back in 2005. The Court finds that Dicomitis could not have knowledge of his illegal termination claim at that time because termination did not occur until September 11, 2014. Thus, the appropriate date to begin the limitation period is the date of his termination. He appropriately filed a charge with the department within 180 days, awaited a final decision from the MHRC, and then filed his civil suit within 90 days. Consequently, Dicomitis' illegal discrimination claims post-termination are not time barred.

**B.    ADA Claims**

UPS next argues that even if Dicomitis' termination claim is not time

barred, he is unable to establish a prima facie ADA claim because he is not a "qualified individual" under the ADA and has not suffered an adverse employment action. Dicomitis claims that he has demonstrated that he is a qualified individual with a disability and has suffered hardship as a result of being denied his seniority rights at UPS.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability." 42 U.S.C. § 12112(a) (1995). "To prevail on an ADA claim of unlawful discharge, the plaintiff must establish a prima facie case by showing that: (1) he is a disabled person within the meaning of the statute; (2) he is a qualified individual with a disability; and (3) he suffered an adverse employment action because of his disability." *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 891 (9th Cir. 2001). "Once the plaintiff has made this showing, the employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002). It is undisputed that Dicomitis was terminated because of his disability. Therefore, the only questions are (1) whether he was a "qualified individual", and (2) whether he "suffered an adverse employment action because of his disability."

A "qualified individual" is defined as "an individual with a disability who,

with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). This "includes individuals who could perform the essential functions of a reassignment position, with or without reasonable accommodation, even if they cannot perform the essential functions of the current position." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1111 (9th Cir. 2000) (en banc), *cert. granted in part*, 532 U.S. 970 (Apr. 16, 2001). The plaintiff bears the burden of proving that he is qualified. *Hutton*, 273 F.3d at 892; *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1108 (9th Cir. 2000).

Therefore, under the second prong of the test, this Court considers whether Dicomitis can perform the job's essential functions without reasonable accommodation, and then, if he cannot, whether he can do so with reasonable accommodation. The term "essential functions" refers to the "fundamental job duties of the employment position the individual with a disability holds or desires." *Dark v. Curry Cty.*, 451 F.3d 1078, 1087 (9th Cir. 2006). It does not "include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A job function may be considered "essential" for various reasons. *See id.* § 1630.2(n)(2)(i)–(iii). Further, "consideration shall be given to the employer's judgment as to what functions of the job are essential, and if an employer has

prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(n)(3) (requiring consideration of the amount of time spent performing the function).

Here, the essential job functions of a package driver included: delivering and picking up packages at a constant pace for an average of 9.5 hours per day plus extended hours depending on service needs; lifting, lowering, pushing, pulling, leveraging, and manipulating equipment and packages weighing up to 70 pounds; assisting in moving packages up to 150 pounds; and lifting packages to heights above the shoulder and lower packages to foot level. (Docs. 17-3, 17-4, 17-5.) Dicomitis reached maximum medical improvement in 2005, and Dr. Rotar restricted his lifting to no more than 25 pounds. Dicomitis does not contest that lifting and moving heavy packages is an essential function of the position. Instead, he insists that he could perform the essential job functions of another position in the company. (Doc. 22 at 4.) Thus, there is no dispute that Dicomitis could not perform the essential job functions of a package driver without reasonable accommodations.

Hence, the question becomes whether Dicomitis can perform his job with reasonable accommodations. The term "reasonable accommodation" includes:

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities

42 U.S.C. § 12111(9). There is no dispute that UPS could not restructure the package driver position to suit Dicomitis' disability. The parties' disagreement is whether there was a vacant position available at UPS.

UPS contends that Dicomitis has provided no evidence that there was an open position that his doctor would have released him to work at the time of his termination, that UPS had no duty to initiate an interactive process when the last time Plaintiff inquired about any type of work was in regards to seasonal work through the Union in 2011, and that he failed to contact UPS Human Resources despite knowing how and being able to do so. (Doc. 16 at 30–31.) Dicomitis contends that under *U.S. Airways, Inc. v. Barnett*, the employer is in the better position to identify possible alternative positions or accommodations, and the employer is required to identify such positions or accommodations as part of the

-21-

interactive process required by the ADA.[7]  535 U.S. at 401.

Under the analysis in *Barnett*, a plaintiff must first show that his proposed accommodation was reasonable on its face. *Barnett*, 535 U.S. at 401.  Once a plaintiff does that, the burden shifts to the employer to show that the proposed accommodation would create an undue hardship. *Id*. at 402.  Dicomitis misstates the ruling in *Barnett*.  He contends that he need only "show that an accommodation 'seems reasonable on its face, i.e. ordinarily or in the run of cases.'" (Doc. 22 at 4 (citing *Barnett*, 535 U.S. at 401)).  In *Barnett*, the reasonable accommodation request was in fact made because the plaintiff met his initial burden to prove that a mailroom job was vacant at U.S. Airways which he could have been assigned to.  Here, Dicomitis has offered no evidence of any vacant position at UPS that he could have been reassigned to.  He believes that simply requesting an "accommodation," generally, is enough to be a reasonable request.  Yet, he fails to complete his burden to actually request a "vacant position" that is

---

[7] *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105 (9th Cir.2000) (en banc), was appealed to the United States Supreme Court and the writ of certiorari was granted in part and limited to Question 1 presented by the petition. *US Airways, Inc. v. Barnett*, 532 U.S. 970 (2001).  The question before the Supreme Court was whether the ADA requires an employer to assign a disabled employee to a particular position even though another employee is entitled to that position under the employer's "established seniority system." *Barnett*, 535 U.S. at 406.  The Supreme Court affirmed the Ninth Circuit's two-step test for determining whether the plaintiff is a "qualified person." *Id*. at 397.  The Supreme Court also concluded that a plaintiff is allowed to make a showing of special circumstances surrounding the particular case that demonstrate the assignment is nonetheless reasonable.  That conclusion has no bearing on this case.

available. 42 U.S.C. § 12111(9)(B). Therefore, Dicomitis is not a "qualified individual" under the ADA and his claims are dismissed.

## CONCLUSION

The Court first finds that all accommodation claims arising from conduct between 2003 to 2014 are denied as not being administratively exhausted under the MHRA. The Court further finds that while Dicomitis' ADA claims post-termination are not time barred, Dicomitis has failed to prove that he is a "qualified individual" under the ADA. Consequently, his remaining illegal termination claims are denied.

Accordingly, IT IS ORDERED that:

(1) Defendants' motions for summary judgment is GRANTED.

(2) The Jury Trial set for November 13, 2017, is VACATED. All other pretrial dates are VACATED.

(5) The Clerk of Court is directed to enter judgment in favor of Defendants. This case is CLOSED.

DATED this **1**$^{st}$ day of November, 2017.

Dana L. Christensen, Chief Judge
United States District Court